ACCEPTED
01-14-00710-cv
FIRST COURT OF APPEALS
HOUSTON, TEXAS
8/12/2015 11:58:37 PM
CHRISTOPHER PRINE
CLERK

## NO. 01-14-00710-CV

_____

# IN THE
# FIRST COURT OF APPEALS
# HOUSTON, TEXAS

_____

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

8/12/2015 11:58:37 PM

CHRISTOPHER A. PRINE
Clerk

## LEA PERCY MCLAURIN,
### Appellant

### v.

## SCOTT SUTTON MCLAURIN,
### Appellee

_____

## BRIEF OF APPELLEE

_____

**Todd Frankfort**
**State Bar No. 00790711**
**Richard L. Flowers, Jr.**
**State Bar Number 07180500**
**5020 Montrose Boulevard, Suite 700**
**Houston, Texas 77006**
**Telephone 713/654-1415**
**Facsimile 713/654-9898**
**Email: rflowers@rflowerslaw.com**

**ATTORNEYS FOR SCOTT SUTTON MCLAURIN,
APPELLEE**

## **<u>Oral Argument Not Necessary</u>**

Pursuant to Tex. R. App. P. 39.7, Appellee, Scott Sutton McLaurin, requests that this cause be decided without oral argument.

# Table of Contents

Oral Argument Not Necessary................................................................1

Table of Contents................................................................................2

Index of Authorities............................................................................3

Record References & Abbreviations.....................................................7

Statement of Facts...............................................................................9

Summary of the Argument ...............................................................33

Argument and Authorities ................................................................34

    I.   LEA'S SUIT WAS FRIVOLOUS AND BROUGHT IN BAD FAITH, SO SANCTIONS WERE PROPER (APPELLANT ISSUE I. A. & B.)................................................................34

    II.  LEA DID NOT PRESERVE ERROR CONCERNING THE SANCTIONS ORDER, AND THE SANCTIONS ORDER PROVIDES THE BASIS FOR SANCTIONS. (APPELLANT ISSUE I. D.) ...............................................................46

    III.  THE TRIAL COURT WAS WITHIN ITS DISCRETION TO IMPOSE A DATE AND TIME CERTAIN FOR APPELLANT TO PAY THE SANCTIONS ORDERED. (APPELLANT ISSUE II.) ...............................................................49

    IV.  ALTHOUGH THIS COURT IS NOT BOUND BY FINDINGS OF FACT, SUFFICIENT EVIDENCE EXISTS IN SUPPORT OF THE FINDINGS, THE SANCTIONS ORDER, AND THE DENIAL OF LEA'S REQUESTED RELIEF. (APPELLANT'S ISSUES I.C. AND 3).....................................52

CONCLUSION..................................................................................60

# Index of Authorities

## Cases

*Alexander v. Alexander*,
956 S.W.2d 712, 714 (Tex. App.—Houston [14th Dist.] 1997, pet. denied)... 44, 45

*Am. Flood Research, Inc. v. Jones*,
192 S.W.3d 581, 583 (Tex. 2006)....................................................................50

*Braden v. Downey*,
811 S.W.2d 922, 924 (Tex. 1991)...................................................................48

*Bradt v. Sebek*,
14 S.W.3d 756, 761 (Tex. App. – Houston [1st Dist.] 2000, pet. denied) ...............33

*Bushell v. Dean*,
803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g) .........................................44

*Byrnes v. Ketterman*, 440 S.W.3d 688, 690 (Tex. App.—El Paso 2013, no pet.)...48

*Catalina v. Blasdel*,
881 S.W.2nd 295, 297 (Tex. 1994).......................................................51

*Cire v. Cummings,*
134 S.W.3d 835, 838 (Tex. 2004).......................................................32

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384, 398, 110 S.Ct. 2447, 2457, 110 L.Ed.2d 359 (1990)................. 40, 43

*Downer v. Aquamarine Operators, Inc.*,
701 S.W.2d 238, 242 (Tex. 1985).......................................................33

*Elec. Data Sys. Corp. v. Tyson*,
862 S.W.2d 728, 734 (Tex. App.—Dallas 1993, no writ).......................................49

*Elkins v. Stotts-Brown*,
103 S.W.3d 664, 668-69 (Tex. App.—Dallas 2003, no pet.) ................................35

*Falk & Mayfield L.L.P. v. Molzan*,
974 S.W.2d 821, 827 (Tex. App. – Houston [14th Dist.] 1998, writ denied) ..........34

*Franz v. Katy Indep. Sch. Dist.*,
35 S.W.3d 749, 755 (Tex. App.—Houston [1st Dist.] 2000, no pet.)......................49

*Gaspard v. Beadle*,
36 S.W.3d 229, 239 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) ..............46

*Greene v. Young*,
174 S.W.3d 291, 301 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ..... 35, 43

*Harrison v. Harrison*,
363 S.W.3d 859, 863 (Tex. App.—Houston [14th Dist.] 2012, no pet.) ................35

*Hatteberg v. Hatteberg*,
933 S.W.2d 522, 526 (Tex. App. 1994, no writ) .......................................................33

*In re Barber*,
982 S.W.2d 364, 366 (Tex. 1998)................................................................................32

*In re Crow-Billingsley Air Park, Ltd.*,
98 S.W.3d 178, 179 (Tex. 2003)......................................................................... 47, 48

*In re King's Estate*,
150 Tex. 662, 244 S.W.2d 660, 661 (1951)...............................................................51

*Keith v. Keith*,
221 S.W.3d 156, 165 (Tex. App.—Houston [1st Dist.] 2006, no pet.)...................47

*Lewis v. Texas Emp. Ins. Ass'n*,
151 Tex. 95, 97-98, 246 S.W.2d 599, 600 (1952) .....................................................44

*Low v. Henry*,
221 S.W.3d 609, 614 (Tex. 2007)....................................................................... 32, 38

*Mattox v. Grimes County Com'rs Court*,
305 S.W.3d 375, 386 (Tex. App.—Houston [14th Dist.] 2010, pet. denied)..........37

*McGalliard v. Kuhlmann*,
733 S.W.2d 694, 696-97 (Tex. 1986) ........................................................................51

*Monroe v. Grider*,
884 S.W.2d 811, 817 (Tex. App.—Dallas 1994), writ denied ................................35

*Nath v. Texas Children's Hosp.*,
446 S.W.3d 355, 361 (Tex. 2014)........................................................ 33, 40, 43

*O'Connor v. Towns*,
1 Tex. 107 (1846)....................................................................................44

*Pool v. Ford Motor Co.*,
715 S.W.2d 629, 635 (Tex. 1986)............................................................51

*Robinson v. National Cash Register Co.*,
808 F.2d 1119, 1131 (5th Cir.1987),
*overruled on other grounds,* 836 F.2d 866 (5th Cir.1988) .....................................35

*Rudisell v. Paquette*,
89 S.W.3d 233, 238 (Tex. App.—Corpus Christi 2002, no pet.) ...........................46

*Scott & White Mem'l Hosp. v. Schexnider*,
940 S.W.2d 594, 596-97 (Tex. 1996) ................................................... passim

*SMB Partners, Ltd. v. Wightman*,
01-99-00217-CV, 1999 WL 994057, at *1-2 (Tex. App.—Houston [1st Dist.] Oct. 28, 1999, no pet.) (not designated for publication)....................................................44

*Thomas v. Capital Sec. Services, Inc.*,
836 F.2d 866, 868 (5th Cir. 1988) ..........................................................48

*TransAmerican Natural Gas Corp. v. Powell*,
811 S.W.2d 913, 917 (Tex. 2002)...........................................................40

*Unifund CCR Partners v. Villa*,
299 S.W.3d 92, 97 (Tex. 2009)........................................................ 32, 38

*Westergren v. Jennings*,
441 S.W.3d 670, 677 (Tex. App.—Houston [1st Dist.] 2014, no pet.)...................33

**Statutes**

Tex. Civ. Prac. & Rem. Code Ann. § 10.001 (Vernon)..........................................37

Tex. Civ. Prac. & Rem. Code Ann. § 10.002 (Vernon)............................................38
Tex. Civ. Prac. & Rem. Code Ann. § 10.004 (Vernon)............................................37

**Rules**

Fed. R. Civ. P. 11 ...................................................................................................40
Tex. R. App. P. 33.1.................................................................................................44
Tex. R. App. P. 38.1(i).............................................................................................49
Tex. R. App. P. 44.1.................................................................................................46
Tex. R. Civ. P. 13 ............................................................................................ 34, 35
Tex. R. Civ. P. 308.................................................................................................47

## Record References & Abbreviations

All references to the Clerk's Record will be noted by "CR" followed by the appropriate page number (e.g. CR 17).

All references to the Supplemental Clerk's Record will be noted by "Supp. CR" (e.g. Supp. CR 12).

All references to the Reporter's Record will be noted by "RR" followed by the appropriate volume and page number (e.g. RR 2:22 refers to Reporter's Record Volume 2, Page 22).

All references to the exhibits offered at trial by Appellant (Petitioner at trial) will be noted by "PE ___" followed by the trial exhibit number, and page number, if applicable.

The exhibits offered at trial by Appellee (Respondent below) will be denoted "RE ___" followed by the trial exhibit number and page number, if applicable.

**NO. 01-14-00710-CV**

_____

**IN THE**
**FIRST COURT OF APPEALS**
**HOUSTON, TEXAS**

_____

**LEA PERCY MCLAURIN,**
**Appellant**

**v.**

**SCOTT SUTTON MCLAURIN,**
**Appellee**

_____

**BRIEF OF APPELLEE**
_____

**TO THE COURT OF APPEALS:**

Appellee, Scott Sutton McLaurin ("Scott"), submits this Appellee's Brief, in response to Appellant's Brief, filed by Lea Percy McLaurin ("Lea"). This matter stems from Lea's post-divorce filing of an enforcement action against Scott. At the conclusion of trial, Scott was awarded sanctions against Lea for her having filed a frivolous motion. All matters between the parties were heard in the 309th Judicial District Court of Harris County, Texas, the Honorable Sherry Y. Dean, presiding.

## Statement of Facts

To correct certain inaccuracies contained in Appellant's Statement of Facts, Scott offers this Statement of Facts.

Lea and Scott, each a medical doctor by training, were married, but on February 4, 2009, Lea filed a divorce action. (RR 1:46).

In their divorce action, Lea's counsel was J.D. Bucky Allshouse ("Allshouse"), and Scott's counsel was Richard L. Flowers, Jr. ("Flowers") (PE 1). The parties attended two mediation sessions in an effort to resolve the issues in their divorce. (RR 3:45) They reached an agreement at mediation, which was ultimately memorialized in a Final Decree of Divorce ("Decree") (PE 1) and an Agreement Incident to Divorce ("AID") (PE 2). The parties signed the AID and the trial court entered the Decree on September 3, 2010. (PE 1 & 2).

On September 7, 2010 – four days following the divorce – Flowers sent a letter to Allshouse, which, included the following pertinent statements:

- "I'm sending an assignment for Scott's share of the savings bonds. However, I think the bonds will have to be endorsed."

- "The Lincoln Investment account is being divided as per the AID. The actual securities are being divided so Lea will need to let Ross McLaurin[1] know where he is to send her share of these securities."

- "Otherwise, here's what I see as the remaining action items:

---

[1] Ross McLaurin shall be hereinafter referred to as "Ross."

9

1. The savings bonds need to be divided. Lea has possession of all the bonds so I need to know when and where to pick them up from her.
2. Scott will exchange the diamond for his Rolex. Again, please let me know when Lea's ready to do that.
3. Scott needs to get the plates, Christmas ornaments and stuffed animals ready for Lea to pick up.
4. The parties need to make arrangements for copying photos and videos."

(RE 20). The letter was part of Scott's effort to divide the property awarded to each of the parties pursuant to the AID and Decree. (RR 6:25).

Following the September 7 letter, Scott received additional documents from Allshouse that he was to sign in order to transfer "things" to Lea. (RR 5:154).

On September 8, 2010, Scott executed three transfer documents, assigning to Lea various assets. (RE 22). Scott signed these documents in an effort to promptly effectuate transfer following the conclusion of the divorce. (RR 6:26). Later, Flowers sent a "corrected Assignment of Interest" to Allshouse for Lea's signature (R 23) to effectively divide the savings bonds. (RR 6:28).

On Tuesday, January 4, 2011, Lea, by and through Daniel Lemkuil ("Lemkuil") filed a Motion to Enforce Final Decree of Divorce and Agreement Incident to Divorce (the "Original Enforcement") (Supp. CR 37). In the Original Enforcement, Lea sought (generally and in addition to various unfounded tort claims) to enforce the transfer of ten items awarded to Lea in the AID: (i) a diamond given to Lea by Patrick Brannan ("Item 1"); (ii) "coins belonging to Lea

or Christopher" (the parties' son) ("Item 2"); (iii) real property in Oklahoma ("Item 3"); (iv) a First Colony Life Insurance Policy ("Item 4"); (v) a portion of an account with Lincoln Investments ("Item 5"); (vi) various United States Savings Bonds ("Item 6"); (vii) a 2006 Lexus GX470 ("Item 7"); (viii) the award of "fifty percent (50%) net of taxes of ANY bonuses or reimbursements received by Husband through April 30, 2010" ("Item 8"); (ix) the contents of safety deposit boxes at BBVA Compass and Wells Fargo banks ("Item 9"); and (x) various Christmas ornaments and other personal property ("Item 10").  (Supp. CR 37-44).

Upon learning of the Original Enforcement, Flowers sent Lemkuil a letter dated January 11, 2011, which – in pertinent part – said:

> As a vital part of the reasonable inquiry you are required to have done prior to initiating this motion, I'm assuming you have spoken to Bucky Allshouse and members of his staff, including Rebecca Tipton about the efforts they made along with my office to conclude the property transfers.  I invite you to call Ross McLaurin, telephone number 713/789-0800, and inquire about his many efforts to date to transfer property to your client.  You (sic) client refuses to cooperate with anyone.  She also refuses to transfer property she has to my client.

(RE 24).

On January 25, 2011, Flowers sent a letter to Lemkuil "following up to schedule a meeting to discuss what remains to be done to close this case." (RE 26).

On February 1, 2011, Lemkuil sent a letter to Flowers, asking Flowers to make Items 1 through 10 available to him at a meeting scheduled for February 3, 2011. (RE 25).

On February 3, 2011, Flowers and Lemkuil met at Flowers' office, ostensibly to resolve the matter. (RR 6:133; RE 27). Lemkuil abruptly ended the meeting after a short period. Flowers then sent an email outlining Scott's position relative to the Original Enforcement, stating, "The September 7th letter [to Allshouse] addresses nearly every item made the basis of your enforcement action. Virtually every issue not addressed in my September 7th letter but made the basis of your enforcement suit has never been requested or addressed until you filed your lawsuit." (RE 27). Flowers specifically addressed the following issues:

### Item 1 (Diamond)

"We've always stood ready to exchange the diamond for my client's Rolex watch, but Lea refuses."

### Items 4 & 6 (First Colony & Savings Bonds)

"Also attached are copies of assignments signed by my client last September and October which we've had ready to exchange for the assignments from your client to mine."

## Item 5 (Lincoln Investments)

"In my January 11, 2011 letter to you I invited you to call my client's financial advisor, Ross McLaurin, and provided his telephone number, 713/789 – 0800. I know you never called Ross. If you had you would have learned about his efforts to transfer funds to your client. You also seemed to know nothing about the financial advisor Lea hired who Ross has been working with. You also knew nothing about the information Ross and Lea's financial advisor had exchanged about the very issue made the basis of your lawsuit. You could have asked Ross to provide the documentation your client wants about the Lincoln account."

## Item 10 (Christmas Ornaments)

"[Lea has] never attempted to arrange to pick up the plates, ornaments, and other items which have been boxed and ready to exchange for months."

Id. Flowers concluded, stating, "Dan, if you pursue this lawsuit without making any inquiry I will immediately file a bad faith claim against you and your client. Handle it correctly and we'll get it resolved." Id. In response to Flowers' February 3 email, Lemkuil pithily stated, "You are wrong. Strike three." Id.

On March 15, 2015, at 10:34 a.m., Lea non-suited the Original Enforcement. (Supp. CR 47).

That same day, at 2:09 p.m., Lea filed a Motion to Enforce Final Decree of Divorce and Agreement Incident to Divorce (the "New Enforcement"). (Supp. CR 48). In her brief, Lea claims that she filed the New Enforcement after "having

narrowed the issues," but Items 1 through 10 in the New Enforcement were identical to the Original Enforcement. (Supp. CR 37).

On April 25, 2011, upon learning of the filing of the New Enforcement, Flowers agreed to accept service on Scott's behalf, and inquired as to Lemkuil's authority for serving a precept in what amounted to a breach of contract case. (RE 28). The record is void of any response from Lemkuil.

On April 27, 2011, Flowers, having accepted service of a precept, inquired as to the legal authority upon which Lemkuil relied. Lemkuil refused to discuss the matter. (RE 29). At the conclusion of his April 27 letter, Flowers stated, "You are urged once again to immediately non-suit this bad faith claim so as to mitigate any further unnecessary expense to my client. It's been very obvious since you first appeared in this matter that you have made no inquiry into these facts whatsoever." Id. The record is void of any response from Lemkuil.

Later in the day on April 27, 2011, Flowers sent a follow-up letter, correcting a misunderstanding about a hearing date. (RE 30). At the conclusion of the second April 27 letter, Flowers gave a similar warning to Lemkuil. Id. The record is void of any response from Lemkuil.

On Sunday, May 1, 2011, Flowers sent another email to Lemkuil, which says, in part, "You've failed to respond to my letters regarding the improvident

motion to enforce and the show cause order and precept you had issued." (RE 31). The record is void of any response from Lemkuil.

On June 21, 2011, Flowers' office sent another letter, again addressing each of the items raised in the New Enforcement. (RE 32). The June 21 letter begins, "I have called your office several times to discuss closing this case. I have not heard back from you. This is another effort at resolving this matter and to minimize the time and unnecessary expenses accruing in concluding this matter." Id. Moreover, the June 21 letter specifically addresses each of Items 1 through 10. Id. Rather than recite the entire contents of the June 21 letter, a true and correct copy has been attached hereto as Appendix 1.

After a few months, on August 18, 2011, Scott filed a Motion for Sanctions for Bad Faith Filing, but Scott proceeded to trial on his Second Amended Motion for Sanctions for Bad Faith Filing ("Sanctions Motion"). (CR 3-8). In the Sanctions Motion, Scott sought recovery of his attorney's fees, court costs, and litigation expenses, jointly and severally from Lea and from Lemkuil. (Id.)

On September 7, 2011, Flowers sent yet another email to Lemkuil after Lea had appeared, unannounced, at Flowers' office. (RE 33). The letter concludes, "This is another amazing chapter of a ridiculously difficult case. There is no conceivable way this could be worth the time and money which has been and will be spent." Id.

On May 25, 2012, Flowers sent "another attempt at settlement" to Lemkuil. (RE 37). (The letter dated May 25, 2012 is among the voluminous attachments to RE 37. For ease of reference and to save the Court's time in reviewing exhibits, a true and correct copy of the letter is attached hereto as Appendix 2 and cited as "RE 37-A.") In Flowers' May 25 letter, he again tracks Items 1 through 10, states his belief that each of the Items had been resolved, and offers to settle the matter. (RE 37-A)

On November 9, 2012, Lea filed a First Amended Motion to Enforce Final Decree of Divorce and Agreement Incident to Divorce (the "1st Amended Enforcement"), in which she restated the allegations contained in the Original Enforcement and the New Enforcement. (Supp. CR 58). Over the course of the litigation, Lea filed five different versions of her enforcement pleading, amended her pleading four times, each time, either omitting causes of action that were clearly not valid OR not changing the allegations in the pleading – AT ALL. (Supp. CR 66, 71, 144)

On March 27, 2013, Lea filed her Fourth Amended Motion to Enforce Final Decree of Divorce and Agreement Incident to Divorce ("4th Amended Enforcement"), in which she abandoned all prior allegations, EXCEPT for the following:

- The award of the diamond given by Patrick Brannan, and located in a safe deposit box at Chase Bank, Medical Center location;

16

- The "fifty percent (50%) net of taxes of ANY bonuses or reimbursements received by Husband through April 30, 2010"; and

- A cause of action for conversion against Scott.

(RE 55).

During trial, each side testified on their own behalf. In addition, Scott called one fact witness to present evidence of some of the difficulties that had been encountered in transferring property to Lea. Given Lea's sufficiency challenges and challenges to the findings of fact, it is important to review a summary of the pertinent testimony adduced at trial.

*Scott's Testimony*

During trial, Scott testified that at the beginning of the lawsuit, he recognized that he was being sued over a list of "about 10 things," initially. (RR 6:68):

Item 1 (Diamond) – Scott testified that there was some confusion, at least in his mind, about which diamond Lea had, which diamond was in question, and which diamond he was obligated to turn over to Lea. (RR 6:74). Scott said that he turned over both the "mine cut diamond" and the "Brandon (sic) diamond." (RR 5:129). He testified that he found one diamond in his safe, and – thinking it was the Patrick Brannan Diamond –gave it to Lea. (RR 5:149). He later found a second diamond, and turned it over to Lea, too. (RR 5:150). He further testified

17

that each time Lea insisted that he had the Patrick Brannan Diamond, he looked for it, and was unable to find it. (RR 6:74)

Item 2 (Coins) – Scott testified that he did not have any of the coins referenced in the AID. (RR 5:133). Flowers' office confirmed as much to Lemkuil in writing. (RE 32).

Item 3 (Oklahoma Property) – Scott testified that he was not given a deed to sign, transferring any interest in the Oklahoma property, but that when Lea finally did send a deed, he "accepted it." (RR 6:57-58) Correspondence from Flowers' office informed Lea and Lemkuil of this fact. (RE 32)

Item 4 (Life Insurance Policy) – Scott testified that he did not recall any document pertaining to transfer of the First Colony Life Insurance policy to Lea (RR 5:159-160); however, Scott did sign an Assignment of Interest dated September 8, 2010, and received from Allshouse, which purported to transfer the policy to Lea. (RE 22).

Item 5 (Lincoln Investments) – Scott testified that he signed a document transferring the Lincoln account to Lea. (RR 5:143).

Item 6 (Savings Bonds) – Scott testified that he signed documents transferring the applicable savings bonds to Lea, around the time their divorce was finalized. (RR 5:159; RE 20, 22). Scott further testified on cross-examination that he executed transfer documents for the savings bonds awarded to Lea "every time

[he] was asked to do it." (RR 5:107). Correspondence from Flowers' office confirms Scott's testimony. (RE 20, 22, 27, 32, 37-A). Although at one point during the litigation, Lea claimed that all of the savings bonds were lost, in fact, Lea had some in her possession, and Scott had none. (RR 6:22).

Item 7 (Lexus) – Scott maintained that he did not possess Lea's Lexus keys. (RR 5:132). Correspondence from Flowers' office informed Lea and Lemkuil of this fact. (RE 32, 37-A).

Item 8 (Bonus & Reimbursement) – Scott testified that he recognized that he had an obligation to pay Lea a portion of bonuses and reimbursement that he received by April 21, 2010. (RR 5:139). Scott further testified that he was paid a bonus for the first quarter 2010, but that he did not receive it until the end of April, 2010 – after April 21. (RR 6:10). Scott presented a copy of his bonus check (RE 7), identified the net amount of the bonus received, and testified that he paid Lea one-half of that amount. (RR 6:11-12). Scott identified the cashier's check payable to Lea for half of his first quarter 2010 bonus. (RE 9; RR 6:12). Finally, Scott testified that while investigating whether he had paid the correct amount of bonus, he realized that on May 3, 2010, he received his "February draw check," and gave a reason for the delay in payment. (RE 5 & 6; RR 6:14-17). Scott confirmed this additional draw check was paid after the date the parties signed the AID. He further confirmed that Lea had never claimed any interest in this draw,

19

but that upon receipt, he tendered to Lea a cashier's check for half. (RE 8; RR 6:18-19).

Item 9 (Safe Deposit Boxes) – Although Scott did not testify regarding the existence (or not) of a safety deposit box to which Lea was entitled, RE 32 and 37-A both state, "Scott doesn't have a document listing the contents of the safe deposit boxes at BBVA Compass or Wells Fargo Bank as of September 3, 2010."

Item 10 (Christmas Ornaments) – Scott testified that he made the Christmas ornaments and other related personal property available for Lea, as required by the AID, and the items sat, boxed at his residence for 1.5 years, and then at Flowers' office because Lea refused to retrieve them. (RR 5:111-112).

*Lea's Testimony*

Lea, in response to the questions, "What inquiries did you make into whether or not Mr. McLaurin had your things before you sued him about it?" and "You filed a lawsuit that preceded this one on the same issues, right, virtually?," stated:

**"I have no idea."**

(RR 3:103 & 60, respectively). Lea further testified that she did not see any of her pleadings prior to filing, and could not vouch for their contents because she had not read them. (RR 4:30). Lea testified that she was unaware of any of the efforts made to settle the case (RR 4:32), but then – moments later – testified about a letter

Lemkuil had received (RE 37), and admitted that she was aware of settlement efforts. (RR 4:33).

Testifying over the course of 4 of the 5 days that the case was presented, Lea spoke at length about Items 1 through 10. Although Lea's testimony was difficult to follow at times and she received several admonishments from the trial court concerning her answers (See, e.g. RR 2:50, 2:55, 2:60, 2:68, 3:20, 3:25, 3:28, 3:31, 3:39, 3:40, 3:42, 3:45, 3:57, 3:65, 3:101, 3:126, 3:137[2], 4:16, 4:20, 4:36, 4:40, 4:44, 4:46, 5:18, 5:21, and 5:45), her testimony may be summarized as follows:

Item 1 (Diamond) – Lea testified that she was awarded the Brannan Diamond in the AID. (RR 2:48). She testified that she received a diamond from Scott following their divorce, but that it was not the Brannan Diamond. (RR 2:54). Lea, later, testified that it was possible that she had received the Brannan Diamond. (RR 3:7). Later still, she testified that Scott had showed her the inside of his safe deposit box, and that it contained 2 diamonds. (RR 3:117). Lea confirmed that she is not a jewelry collector; has no specialized knowledge of diamonds; and has no special training or knowledge to enable her to discern one diamond from another. (RR 3:119-120). Lea further admitted that she was "unsure" whether the description of the Brannan Diamond contained in her pleading was accurate. (RR 3:131). Finally, Flowers asked: "You've made these comparisons if it wasn't the

---

[2] The trial court admonished Lea, this time, by saying, "And ma'am, I'm telling you right now, if I hear you ask one more question, I'm going to fine you. Do you understand that?"

round cut diamond it's the old mine cut diamond. You put it in your pleading. That's what I'm asking you about. I'm asking you what investigation research, inquiry, what sort of legwork, if you will, did you do to investigate that claim before you made it?" (RR 3:138). Lea's response: "**Nothing**." Id.

Item 2 (Coins) – In response to Flowers' question "Did you ever send a demand asking your husband -- former husband for coins and stamps out of the safe deposit box?," Lea stated, **"I have no idea."** (RR 3:66). Moreover, despite her testimony that she and Scott do not communicate via email and that she only "occasionally" speaks to him on the telephone (RR 3:67), Lea testified that she asked him for the coins (and stamps) on more than one occasion before she filed the New Enforcement, but could not recall when or how many times. (RR 3:66-67).

Item 3 (Oklahoma) – Lea testified that she had asked Scott to execute a Quitclaim deed to the Oklahoma property "several times," but that he never signed it. (RR 2:56-57). On cross examination, however, she stated that she did present Scott with a deed, but did bring a copy to trial because she did not know to. She testified that she gave the deed to Scott directly, but that the document was also sent "by the attorney" to Scott and to Flowers' office; and that she **"had no idea"** whether anyone responded to the request. (RR 3:102-103). The record is void of any such document, and Lea abandoned the issue at trial. (RE 55).

Item 4 (Life Insurance) – Lea testified that she believed Scott was holding the copy of the life insurance policy that she was awarded pursuant to the AID because "he's mean" and for "revenge," but had "**no idea**" whether he had economic reasons for holding the policy. (RR 3:89) (emphasis added). She further testified that prior to filing for divorce, , she had taken "some boxes" with "some" financial documents out of the house. (RR 3:92). Lea's removal of financial documents would dove-tail with Scott's assertion that he did not have the insurance documents.

Item 5 (Lincoln) – Regarding the Lincoln Investments account, Lea testified that: (i) she hired Allen Weiner, a third party, to assist with dividing the Lincoln account (RR 3:81); (ii) she refused to sign documents that would have transferred her share of the Lincoln account to her (RR 3:78); (iii) she "**had no idea**" that the funds could not be transferred to her without her providing account information (RR 3:85); (iv) she – finally – admitted that she did not provide an account into which her share could be transferred until August, 2012 (RR 3:85), (v) she was no longer pursuing a claim against Scott related to the Lincoln account (RR 3:86), and (vi) she had "**no idea**" how much money Scott had spent on lawyers dealing with that issue (RR 3:87).

Issue 6 (Bonds) – Lea admitted that she refused to sign documents that would transfer her share of the savings bonds to her (RR 3:78), but she had also

already received all of the savings bonds to which she believed she was entitled. (RR 3:14).

Issue 7 (Lexus) – Lea testified that, if she had sent a written demand for return of the key prior to filing suit, she did not bring a copy of that demand with her to court. (RR 3:66). When asked whether she received a letter from Flowers' office, stating that Scott does not have the keys to the Lexus, Lea replied, **"I have no idea."** (RR 3:65). Lea gave the same response to an inquiry as to the value of the Lexus key for which she sued. (RR 3:66). Lea was, in fact, advised in writing that Scott did not have her Lexus key. (RE 32, 37-A).

Issue 8 (Bonus & Reimbursement) – During cross-examination, the following exchange occurred:

> Q: (By Mr. Flowers) In that first paragraph [of page 3 of the 4th Amended Enforcement], just for clarity, I'll read it and you tell me if I read it correctly. 'The bonuses and reimbursements referenced in the Agreement Incident to Divorce include all bonuses or reimbursements earned or received net of taxes only from February 1, 2009 through April 30th, 2010 in an amount not less than $8,526.31 nor more than $75,310.89 prior to interest on the IMED pay, together with other bonuses and reimbursement claims as expressed below for an additional pre-interest claim of $31,618.95.'
>
> Did I read that correctly?
>
> A: Umm, okay.
>
> Q: Did I read it correctly?
>
> A: Yes.

*   *   *

Q: (By Mr. Flowers) Can you please tell the Court what in the world that means?

A: That he has agreed to pay me 50 percent net of taxes of any bonus or reimbursement.

Q: Where did you get the number $8,526.31? Why is that the minimal?

A: I'm not sure.

Q: Okay. Where did you get the number $75,310.89?

A: I'm not sure.

                        \*     \*     \*

Q: Okay. Let me break it up. I'm sorry. Bad question. Let me start with IMED pay. Prior to interest on the IMED pay, what is the interest on the IMED pay?

A: I'm not sure.

(RR 4:19-21).

Ultimately, Lea was unable to testify as to an exact amount of money that she was seeking or as to how any amount was calculated. (RR 4:26). At first, she indicated that she needed additional paperwork, but could not identify any document that had not been produced (RR 4:27), and admitted that she had not asked the trial court to order production of documents. (RR 4:28).

The following day, Lea testified that she was "not sure" whether she had ever itemized her reimbursement claim for Scott (RR 5:71) or had ever sent the list of expenses (RR 5:72-73). Lea "believed" the total amount owed to her was $98,000 (RR 5:73), but was unable to offer any basis for the amount of the claim. (RR 5:75-76).

Issue 9 (Safe Deposit Boxes) – Lea testified that, pursuant to the AID, she was to receive the contents of two safe deposit boxes, one at BBVA Compass, and one at Wells Fargo. (RR 2:70). She maintained she received the entire contents of the Wells Fargo box, but was abandoning the claim. (RR 2:70-71). The record is void of any accounting of items from the Wells Fargo safe deposit box to which Lea claimed she was entitled.

Issue 10 (Christmas Ornaments) – Lea testified that she (i) requested the Christmas ornaments from Scott by sending him typewritten letters, (ii) "may or may not" have copies of the letters, (iii) did not bring any such letters to court (RR 3:56), and (iv) could not remember the time frame of sending the letters. (RR3:58). Although Lea testified that she believed she did not receive all of her Christmas things, she did not ask the trial court to make any orders concerning them (RR 3:14), and the record is void of any reference to any specific item still outstanding.

### *Ross McLaurin*

Scott called Ross McLaurin, his brother. Ross is employed with Lincoln Investments, and acted as the parties' investment advisor both before and during the parties' marriage. (RR 4:71-72). During the time that Ross managed the parties' money, Lea never complained about fees, did not question Ross' honesty, and did not write complaint letters to Lincoln. (RR 4:122). After the parties'

divorce, Ross was to divide the accounts in conformity with the mediated settlement agreement. (RR 4:75). A brokerage account and a retirement account were to be divided. (RR 4:76). The retirement account called for a specific amount to go to Lea, but in the brokerage account, he "took a pro-rata share of each investment and each accounting that's shared and divided it to each party." (RR 4:75-76). In arriving at the division, Ross "…was trying to be as impartial as [he] could to give each person the equal share, after tax benefit, of the assets." (RR 4:100).

Ross testified that in order to initiate a transfer to Lea, she needed to provide the account into which she wanted her shares placed, and that he had difficulty in obtaining that information from Lea. (RR 4:75-76). Ross made effort to obtain the information from Lea directly and from Mr. Weiner. (RR 4:78).

Ross calculated the division of the account in September, 2010. (RR 4:90). He discussed those calculations with Mr. Weiner in mid-November, 2010. (RR 4:79). Ross segregated Scott's portion of the account into a separate account on December 21, 2010. (RR 4:90). In early January, Ross also removed Scott's share of dividends that were paid into the account. (RR 4:91). The interest, dividends, gains, and losses on Lea's portion of the account remained with Lea. (RR 4:111).

In speaking with Mr. Weiner in mid-November, 2010, Ross explained the method by which the account was divided, and Mr. Weiner voiced no objection.

(RR 4:79). Lea did not send any letters to Lincoln Investments, objecting to Ross' division of the account or his management of it. (RR 4:99) Even after Ross and Mr. Weiner reviewed a "spreadsheet with all of the details," neither of them were able to get Lea to designate an account for the transfer or sign paperwork necessary to effect transfer of the Lincoln Investments account. (RR 4:79-80).

Nearly two years later, Ross received a Brokerage and Client Account Transfer Form, signed by Lea and dated August 22, 2012, that finally designated the account into which Lea wanted her assets transferred. (RR 4:81). Ross testified that Scott signed the document within less than a week following receipt, and the assets eventually were transferred to Lea. (RR 4:82-83).

Ross testified that at the end of 2012, when Lea attempted to transfer the assets, she did not include all of the paperwork necessary to effectuate the transfer, so "…[he] provided additional documentation to make the transfer occur, including a letter from Scott, which he signed immediately, to expedite the transfer and make it happen." (RR 4:85). The transfer was completed on January 4, 2013, but the delay was not a result of anything that Scott did. Id. Moreover, Ross testified that he asked Lemkuil for assistance in expediting the transfer of Lea's assets, and that Lemkuil told him he would not assist. (RR 4:86-87).

Despite any whatever complaints she may have had, Lea still asked Ross to transfer the assets to her Vanguard account (RR 4:125), and had dropped Lincoln Investments complaint by the time of trial. (RR 4:126-127).

*Flowers Testimony*

Testifying as an expert on the issue of attorney's fees, Flowers first received notice of Lea's enforcement action before any attempt at service via an email he received from the district clerk's office. (RR 6:119). Almost immediately, Flowers reached out to Lemkuil in an effort to resolve the matter. When Flowers initially inquired as to whether Lemkuil had reviewed the file, Lemkuil responded, "why would he review the file, this is a new case." (RR 6:120). From that point, Flowers began to investigate the case himself, and realized that the breach of contract matter had been improperly filed as a contempt case, with the issuance of a precept (rather than citation). Id. Ultimately, that issue was resolved, but before Flowers filed a motion and prevailed at the hearing. (RR 6:121).

In addition to attending to the matter of the improperly issued precept, Flowers continued his efforts to resolve the case. (RR 6:122; *see e.g.* RE 32, 37-A). Flowers discovered that no effort had been made by Lemkuil or Lea to make inquiry into the claims asserted prior to filing either lawsuit. Id. As early as February, 2011, Flowers informed Lemkuil of his belief that no investigation had been made. (RR 6:133-134).

Lea (through Lemkuil) served written discovery to which Scott (through Flowers) had to respond (RR 6:122). Lea (through Lemkuil) noticed several depositions which Flowers attended. (RR 6:124). There were several discovery disputes, each of which required a discovery hearing before Judge David Farr, 312th Judicial District Court. Id. In November, 2011, everyone realized that Judge Farr had previously mediated the parties' temporary orders during a time when he was not on the bench, so the matter was assigned to the 309th. Id. All of these ancillary matters consumed substantial time and effort from Flowers and his staff.

In addition to the several court appearances and trial resets that occurred (RR 6:125), it proved necessary for Flowers to spend an extraordinary amount of time trying to "sort out the very nebulous claims that had been made." Id. Flowers testified that "…up to this moment we didn't know what the claims were. It's been difficult. It was very difficult to sort through that…a lot of attorney time to sort through these various things to figure out what it was she claimed was missing." (RR 6:125-126).

Flowers testified that the total amount invoiced by his firm was $68,844.25 based upon three invoices, which were collectively admitted into evidence. (RR 6:126; RE 36). Flowers further testified to an additional amount of $25,000.00, which were the attorney's fees Scott incurred through the trial of the case. (RR 6:127).

*Trial Court Ruling*

At the conclusion of the evidence, the trial court took the matter under advisement. (RR 6:148). On March 3, 2014, the trial court rendered its ruling, and on April 8, 2014, the trial court entered its Final Judgment on Lea Percy McLaurin's Motion to Enforce and Scott Sutton McLaurin's Motion for Sanctions and Bad Faith Filing (the "Sanctions Judgment"). (CR 12).

The Sanctions Judgment denied Lea the relief she sought (CR 13), granted the Sanctions Motion (CR 13-15), and ordered sanctions, stating, in pertinent part:

> The Court having considered the pleadings, evidence, and arguments of counsel finds that the allegations contained in LEA PERCY McLAURIN's 4th Amended Motion to Enforce Final Decree of Divorce and Agreement Incident to Divorce are generally false, groundless and brought in bad faith. The lawyer filing these pleadings failed to make reasonable inquiry before filing said groundless and bad faith pleadings. Rule 13, Texas Rules of Civil Procedure. The Court makes the following findings in support of this final judgment for sanctions, to wit
>
> *     *     *
>
> The attorney who filed these pleadings failed to make the reasonable inquiry required prior to filing the suit. Further, after these fact were brought to the attention of the attorney during a meeting with the undersigned, he continued to refuse to dismiss this frivolous suit.
>
> The Court having considered the pleadings, evidence and argument of counsel GRANTS the

31

> Motion for Sanctions for Bad Faith Filing filed by SCOTT SUTTON MCLAURIN. It is therefore,
>
> ORDERED, ADJUDGED and DECREED that SCOTT SUTTON MCLAURIN is hereby granted a judgment against LEA PERCY MCLAURIN as reimbursement for attorney's fees incurred and paid in this case in the amount of Fifty Two Thousand Three Hundred Seventy Eight and 88/100 Dollars ($52,378.88). It is further ORDERED that all Lea PERCY MCLAURIN shall pay to SCOTT SUTTON MCLAURIN the judgment amount of $52,378.88 by cash, cashier's check or money order on or before June 12, 2014 at or before 3:00 PM, by delivering cash, cashier's check or a money order in said amount payable to SCOTT SUTTON MCLAURIN at the law offices of Flowers & Frankfort, attention Richard L. Flowers, Jr., 5020 Montrose Blvd., Suite 700, Houston, Texas.

(CR 13-15).

Lea timely appealed the Sanctions Judgment (CR 62), but has neither superseded nor paid the amount of the judgment.

Given the evidence presented at trial, the trial court was well within its discretion to: (i) issue the Sanctions Order, (ii) to include a date and time certain by which Lea was to comply with the sanctions issued, and (iii) to deny Lea the relief she sought.

The Sanctions Order should be AFFIRMED.

## Summary of the Argument

I.  **LEA'S SUIT WAS FRIVOLOUS AND BROUGHT IN BAD FAITH, SO SANCTIONS WERE PROPER (APPELLANT ISSUE I. A. & B.)**

II. **LEA DID NOT PRESERVE ERROR CONCERNING THE SANCTIONS ORDER, AND THE SANCTIONS ORDER PROVIDES THE BASIS FOR SANCTIONS.  (APPELLANT ISSUE I. D.)**

III. **THE TRIAL COURT WAS WITHIN ITS DISCRETION TO IMPOSE A DATE AND TIME CERTAIN FOR APPELLANT TO PAY THE SANCTIONS ORDERED.  (APPELLANT ISSUE II.)**

IV. **ALTHOUGH THIS COURT IS NOT BOUND BY FINDINGS OF FACT, SUFFICIENT EVIDENCE EXISTS IN SUPPORT OF THE FINDINGS, THE SANCTIONS ORDER, AND THE DENIAL OF LEA'S REQUESTED RELIEF. (APPELLANT'S ISSUES I.C. AND 3)**

<strong><u>Argument and Authorities</u></strong>

**I.    LEA'S SUIT WAS FRIVOLOUS AND BROUGHT IN BAD FAITH, SO SANCTIONS WERE PROPER (APPELLANT ISSUE I. A. & B.)[3]**

### A.    STANDARD OF REVIEW & REQUIREMENTS FOR SANCTIONS

<u>Standard of Review</u>

A court's imposition of a sanction order under is to be reviewed for abuse of discretion. *Low v. Henry*, 221 S.W.3d 609, 614 (Tex. 2007); s*ee also GTE Communications Sys. Corp. v. Tanner*, 856 S.W.2d 725, 730 (Tex. 1993) (applying abuse of discretion standard for review of Rule 13 sanctions). The trial court's ruling should only be reversed upon a showing that the trial court "acted without reference to any guiding rules and principals, such that its ruling was arbitrary or unreasonable." *Id.; Cire v. Cummings,* 134 S.W.3d 835, 838 (Tex. 2004). "The trial court does not abuse its discretion if it bases its decision on conflicting evidence and some evidence supports its decision." *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009) (citing *In re Barber*, 982 S.W.2d 364, 366 (Tex. 1998)).

In conducting its review, the appellate court "must indulge every legal presumption in favor of the trial court's ruling and view the evidence in the light

---

[3]   To avoid confusion, the issue raised by Appellant's Brief is listed (in parentheses) to which the indicated heading is responsive.

34

most favorable to the trial court's ruling." *Hatteberg v. Hatteberg*, 933 S.W.2d 522, 526 (Tex. App. 1994, no writ). A mere error in judgment by the trial court does not constitute an abuse of discretion. *Bradt v. Sebek*, 14 S.W.3d 756, 761 (Tex. App. – Houston [1st Dist.] 2000, pet. denied). The Supreme Court of Texas "…will not hold that a trial court abused its discretion in levying sanctions if some evidence supports its decision." *Nath v. Texas Children's Hosp.*, 446 S.W.3d 355, 361 (Tex. 2014).

Moreover, "[t]he mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred." *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 242 (Tex. 1985). The appellate court should "…make an independent inquiry of the entire record to determine whether the trial court abused its discretion in imposing the particular sanctions." *Westergren v. Jennings*, 441 S.W.3d 670, 677 (Tex. App.—Houston [1st Dist.] 2014, no pet.) No abuse of discretion occurs if the trial court decision is based upon conflicting evidence where some evidence supports the decision. *Barber,* 982 S.W.2d at 366. (Tex. 1998).

Importantly, "[t]he degree of discretion afforded the trial court is…greater when sanctions are imposed for groundless pleadings than when imposed for

35

discovery abuse." *Falk & Mayfield L.L.P. v. Molzan*, 974 S.W.2d 821, 827 (Tex. App. – Houston [14[th] Dist.] 1998, writ denied).

Rule 13

"Courts impose sanctions against parties filing frivolous claims to deter similar conduct in the future and to compensate the aggrieved party by reimbursing the costs incurred in responding to baseless pleadings." *Scott & White Mem'l Hosp. v. Schexnider*, 940 S.W.2d 594, 596-97 (Tex. 1996). Rule 13 of the Texas Rules of Civil Procedure provides, in relevant part, the following:

> The signatures of attorneys or parties constitute a certificate by them that they have read the pleading, motion, or other paper; that to the best of their knowledge, information, and belief formed after reasonable inquiry the instrument is not groundless and brought in bad faith or groundless and brought for the purpose of harassment... If a pleading, motion or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, after notice and hearing, shall impose an appropriate sanction available under Rule 215-2b, upon the person who signed it, a represented party, or both.

Tex. R. Civ. P. 13. As used in Rule 13, the term "groundless" means that the suit "had no basis in law or fact and [was] not warranted by good faith argument for the extension, modification, or reversal of existing law." *Id.* In making its determination of whether a pleading was groundless, the trial court should use the objective standard of whether the party and her counsel made a reasonable inquiry

36

into the legal and factual basis of the claim, looking "to the facts available to the litigant and circumstances at the time the suit was filed." *Harrison v. Harrison*, 363 S.W.3d 859, 863 (Tex. App.—Houston [14th Dist.] 2012, no pet.). In addition, the trial court may consider the entire history of the case. *Greene v. Young*, 174 S.W.3d 291, 301 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

In addition to showing that the offending pleading is groundless, the party seeking sanctions must further demonstrate that it was brought in bad faith. Tex. R. Civ. P. 13. "A party acts in bad faith when discovery puts him on notice that his understanding of the facts may be incorrect, and he does not make reasonable inquiry into the facts before filing the pleading." *Elkins v. Stotts-Brown*, 103 S.W.3d 664, 668-69 (Tex. App.—Dallas 2003, no pet.) In other words, sanctions may be imposed "…for a party's or his counsel's failure to inquire into the facts after he is on notice the facts are not what he believes." *Monroe v. Grider*, 884 S.W.2d 811, 817 (Tex. App.—Dallas 1994), writ denied (citing *Robinson v. National Cash Register Co.,* 808 F.2d 1119, 1131 (5th Cir.1987), *overruled on other grounds,* 836 F.2d 866 (5th Cir.1988)).

In this case, Lemkuil was notified that his understanding of the facts may be incorrect as early as January, 2011, but he did not make further inquiry into the facts. (RE 24, 25, 26, 27,) Instead, he filed the New Enforcement. (Supp. CR 48 & ___). Lemkuil's investigation of Lea's claims was minimal at best, but was

certainly not adequate. At trial, Lea ended up abandoning all but 2 of the initial Items 1 through 10 (RE 55), but not before Scott had to endure years of litigation in disproving Lea's nebulous claims. Lea admitted that she did "nothing" to investigate her claims related to the Brannan Diamond (RR 3:138), and could not substantiate any of the $98,000 bonus/reimbursement claim. (RR 5:73-75).

The trial court properly granted sanctions because – examining the facts at the time the New Enforcement was filed and considering the entire history of the case, Lea's pleading was groundless and, after she (or her lawyer) learned that the facts may not what she believed, no reasonable inquiry was made. The trial court's judgment should be affirmed.

### *Chapter 10 – Civil Practice and Remedies Code*

Similar to Rule 13, Chapter 10 of the Texas Civil Practice & Remedies Code provides further relief for litigants, stating:

> The signing of a pleading or motion as required by the Texas Rules of Civil Procedure constitutes a certificate by the signatory that to the signatory's best knowledge, information, and belief, formed after reasonable inquiry:
>
> (1) the pleading or motion is not being presented for any improper purpose, including to harass or to cause unnecessary delay or needless increase in the cost of litigation;
>
> (2) each claim, defense, or other legal contention in the pleading or motion is warranted by existing law or by a nonfrivolous argument for the extension,

modification, or reversal of existing law or the establishment of new law;

(3) each allegation or other factual contention in the pleading or motion has evidentiary support or, for a specifically identified allegation or factual contention, is likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) each denial in the pleading or motion of a factual contention is warranted on the evidence or, for a specifically identified denial, is reasonably based on a lack of information or belief.

Tex. Civ. Prac. & Rem. Code Ann. § 10.001 (Vernon).

In other words, "[s]anctions under chapter 10 of the Civil Practice and Remedies Code are authorized if the evidence establishes that (1) a pleading or motion was brought for an improper purpose, (2) there were no grounds for legal arguments advanced, or (3) a factual allegation or denial lacked evidentiary support." *Mattox v. Grimes County Com'rs Court*, 305 S.W.3d 375, 386 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). When a court determines that a litigant has filed a pleading in violation of Sec. 10.001, it may impose a sanction, which may include "an order to pay to the other party the amount of the reasonable expenses incurred by the other party because of the filing of the pleading or motion, including reasonable attorney's fees." Tex. Civ. Prac. & Rem. Code Ann. § 10.004 (Vernon). Furthermore, "[t]he court may award to a party prevailing on a motion under this section the reasonable expenses and attorney's fees incurred in

39

presenting or opposing the motion, and if no due diligence is shown the court may award to the prevailing party all costs for inconvenience, harassment, and out-of-pocket expenses incurred or caused by the subject litigation."  Tex. Civ. Prac. & Rem. Code Ann. § 10.002 (Vernon).

**B.   LEA DID NOT MAKE THE APPROPRIATE INQUIRY BEFORE FILING THE NEW ENFORCEMENT, SO TRIAL COURT WAS WITHIN ITS DISCRETION TO ORDER SANCTIONS AGAINST HER.**

To support the Sanctions Motion, Scott needed competent proof that (1) a reasonable inquiry into Lea's allegations would have disclosed that not all the allegations pled had or would likely have evidentiary support, and (2) Lea did not make a reasonable inquiry before filing suit.  *Unifund*, 299 S.W.3d at 97 (Tex. 2009) (citing *Low*, 221 S.W.3d at 617 (Tex. 2007))..

Flowers notified Lemkuil that Lea's claims were frivolous in January, 2011 (RE 24), at least twice in February, 2011 (RR 6:133; RE 27), at least twice in April, 2011 (RE 29 & 30), and at least once in May, 2011 (RE 31).  In June, 2011, Flowers' office sent Lemkuil a detailed letter, specifically addressing Items 1 through 10.  (RE 32).  The record is void of any evidence of Lemkuil's investigation of Lea's claims following his receipt of any of these notifications (especially after Flowers' June, 2011 letter); instead, Lemkuil proceeded with serving written discovery and noticing depositions, causing Scott's prolonged involvement in frivolous litigation – at great expense.  (RR 6:122, 124, 125).

Lea has taken the position that her amending her pleadings to eliminate moot issues renders the Sanctions Order improper because it is based, in part, on the eliminated allegations, a situation similar to that presented in *Scott & White Memorial Hospital v. Schexnider*. In *Scott & White,* the plaintiffs filed suit against some 33 defendants in a medical malpractice suit. *Scott & White*, 940 S.W.2d at 595 (Tex. 1996)*.* All 33 defendants, filed a motion for summary judgment, but before the trial court could rule, plaintiffs nonsuited all but two defendants by omitting them from an amended pleading. *Id.* The trial court ended up granting summary judgment in favor of the remaining defendants, after which all defendants moved for sanctions pursuant to Rule 13, which the trial court granted. *Id.* The Austin Court of Appeals overruled the sanctions order. *Id.* In overturning the court of appeals, the Supreme Court of Texas followed the United States Supreme Court holding interpreting Federal Rule of Civil Procedure 11 (prior to that rule's amendment to allow a "safe-harbor"):

> Baseless filing puts the machinery of justice in motion, burdening courts and individuals alike with needless expense and delay. Even if the careless litigant quickly dismisses the action, the harm triggering Rule 11's concerns has already occurred. Therefore, a litigant who violates Rule 11 merits sanctions even after a dismissal. Moreover, the imposition of such sanctions on abusive litigants is useful to deter such misconduct. If a litigant could purge his violation of Rule 11 merely by taking a dismissal, he would

lose all incentive to "stop, think and investigate more carefully before serving and filing papers.

*Id.* at 597 (quoting *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 398, 110 S.Ct. 2447, 2457, 110 L.Ed.2d 359 (1990) (citation omitted); see also Fed. R. Civ. P. 11).

Similarly, Lea should not be permitted to escape sanctions for her frivolous claims on the basis that she eliminated those claims along the way. Lea did not conduct any investigation of her claims prior to filing suit, and had she done so, the ensuing two and a half years of litigation would probably not have occurred. The Sanctions Order should be affirmed.

## C. THE SANCTIONS ORDERED BY THE TRIAL COURT ARE "JUST," AND SHOULD BE UPHELD.

In considering whether sanctions ordered by a trial court comport with due process, the Supreme Court of Texas, in *TransAmerican Natural Gas Corp. v. Powell*, adopted a two prong test. *See Nath*, 446 S.W.3d at 363 (Tex. 2014). "First, a direct relationship must exist between the offensive conduct and the sanction imposed. This means that that a just sanction must be directed against the abuse and toward remedying the prejudice caused the innocent party." *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 2002). "Second, just sanctions must not be excessive. The punishment should fit the crime." *Id.*

In this case, the trial court heard the following evidence:

- Scott was in the process of executing documents to effectuate the transfer of Lea's property almost immediately following their divorce. (RR 5:154, 6:26).

- Without warning or investigation, Lea filed a contempt action in an effort to enforce the AID, a contract. (Supp. CR 37; RR 6:119-120).

- When Flowers attempted to resolve the matter before protracted litigation occurred, it became apparent that no investigation had occurred. (RR 6:120).

- After Flowers informed Lemkuil that the facts may not be as Lemkuil understood, Lemkuil non-suited the Original Enforcement and filed the New Enforcement, a virtually identical pleading. (RE 27; Supp CR 47 & 48)

- Substantial attorney and staff time was devoted to responding to discovery and attempting to figure out what property Lea claimed she did not receive. (RR 6:125-126).

- Lea conducted several depositions of witnesses (RR 6:124), but the record does not reflect that any of them were used at trial.

- By trial, Lea had abandoned all but two of the claims related to Items 1 through 10: issues related to the Brannan Diamond and bonus/reimbursements. (RE 55).

- Lea did "nothing" to investigate her claims related to the Brannan Diamond before filing suit. (RR 3:138).

- Lea has no special training or knowledge to enable her to discern one diamond from another (RR 3:119-120), and it was possible that she had received the Brannan Diamond. (RR 3:7).

- On April 30, 2010, Scott received a bonus for the first quarter of 2010 in the net amount of $12,955.27 (RE 7), and prior to her filing the Original Enforcement or the New Enforcement, he paid Lea the sum of $6,877.63, by cashier's check. (RE 9).

- Lea was "not sure" how the damages related to bonus/reimbursement contained in her pleading were calculated. (RR 4:19-21).

- In defending against the frivolous suit(s) Lea filed, Scott incurred attorney's fees and expenses in the amount of $68,844.25 (RE 36; RR 6:126), plus an additional $25,000.00 incurred through the trial of the case (RR 6:127).

Scott incurred $93,844.25 in attorney's fees, and asked the trial court to sanction Lea in that amount. (RR 6:127). After considering the evidence, the trial court sanctioned Lea in the amount of $52,378.88 (CR 29), an amount that is over $41,000 less than the amount Scott requested.

A sanction "…should be no more severe than necessary to satisfy its legitimate purposes." *Nath*, 446 S.W.3d at 363 (Tex. 2014). Two legitimate purposes of sanctions against frivolous claimants are the deterrence of similar conduct in the future, and the compensation of the aggrieved party by reimbursing the costs incurred in responding to baseless pleadings. *Scott & White*, 940 S.W.2d at 597 (Tex. 1996).

Here, Lea, through her abusive litigation and her failure to "stop, think and investigate more carefully before serving and filing papers," caused Scott to incur nearly $100,000.00 in attorney's fees and expense related to his defense. *Cooter & Gell,* 496 U.S. at 398, 110 S.Ct. at 2457, 110 L.Ed.2d 359 (1990). Moreover, in issuing sanctions, the trial court may consider the entire history of the case. *Greene*, 174 S.W.3d at 301 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

The trial court made specific findings related to certain of Items 1 through 10, considered the pleadings and evidence presented (including the entire case history), and, based upon such evidence and findings, "therefore" ordered sanctions against Lea. (CR 13-15).

The sanctions ordered by the trial court were directly related to Lea's and Lemkuil's conduct, were directed against the abuse and towards remedying the prejudice caused to Scott, and were not excessive; therefore, the Sanctions Order should be affirmed.

## II. LEA DID NOT PRESERVE ERROR CONCERNING THE SANCTIONS ORDER, AND THE SANCTIONS ORDER PROVIDES THE BASIS FOR SANCTIONS. (APPELLANT ISSUE I. D.)

### A. LEA'S FAILURE TO PRESERVE ANY PERCEIVED ERROR IN THE SANCTIONS ORDER RESULTS IN HER WAIVING COMPLAINTS ON APPEAL.

It is well established – since the beginning of Texas jurisprudence – that "…to preserve a complaint for appellate review, a party must present to the trial court a timely request objection or motion, state the specific grounds therefor, and obtain a ruling." *Bushell v. Dean*, 803 S.W.2d 711, 712 (Tex. 1991) (op. on reh'g); *Lewis v. Texas Emp. Ins. Ass'n*, 151 Tex. 95, 97-98, 246 S.W.2d 599, 600 (1952); *see also O'Connor v. Towns*, 1 Tex. 107 (1846); Tex. R. App. P. 33.1. It follows that an appellant must object to a lack of particularity of a sanctions order in the trial court before it may raise the complaint on appeal. *Alexander v. Alexander*, 956 S.W.2d 712, 714 (Tex. App.—Houston [14th Dist.] 1997, pet. denied); *accord SMB Partners, Ltd. v. Wightman*, 01-99-00217-CV, 1999 WL 994057, at \*1-2 (Tex. App.—Houston [1st Dist.] Oct. 28, 1999, no pet.) (not designated for publication).

In the instant case, the record is devoid of any objection by Lea to the lack of specificity of the Sanctions Order, about which she now complains. Lea's point of

error relating to the specificity of the Sanctions Order, accordingly, should be overruled. *Alexander*, 956 S.W.2d at 714.

## B. EVEN IF LEA HAD PRESERVED ERROR, IT IS HARMLESS ERROR, SO THE SANCTIONS ORDER SHOULD BE AFFIRMED.

"A Rule 13 sanction order must be supported by specific allegations of good cause," and the failure to do so may be an abuse of discretion. *Gaspard v. Beadle*, 36 S.W.3d 229, 239 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). Such a failure may be harmless error if a trial court's findings of fact and conclusions of law provide the particulars of good cause. *Id.* The Corpus Christi Court of Appeals has concluded that error by the trial court in failing to state the particulars of good cause may be harmless based upon whether the trial court "…did not so 'obscure its reasoning' as to prevent…being able to present [the] issue on appeal." *Rudisell v. Paquette*, 89 S.W.3d 233, 238 (Tex. App.—Corpus Christi 2002, no pet.) (citations omitted); see also, Tex. R. App. P. 44.1.

In the instant case, the trial court made specific findings in the Sanctions Order concerning Item 1 (diamond), Item 2 (coins), Item 3 (Oklahoma property), Item 5 (Lincoln Investment account), Item 6 (savings bonds), and Item 10 (Christmas ornaments, etc.). (CR 28-29). In addition, the trial court's Findings of Fact and Conclusions of Law (collectively, the "Findings of Fact") made specific findings regarding each of the items addressed in the Sanctions Order. (CR 34-38). On the final page of the Findings of Fact, the trial court judge interlineated on the typewritten document, which concluded, "After the facts surrounding Lea's, by

48

and through her attorney of record, failure to make reasonable inquiry were brought to their attention in a meeting with Scott's attorney of record, he continued to pursue a trial regarding Lea's allegations." (CR 38)

Even if Lea had not waived her objection to the Sanctions Order's lack of particularity, the Sanctions Order and the Findings of Fact contain sufficient particularity such that the trial court did not obscure its reasoning to the extent that Lea was prevented from being able to present the issue for appeal. (See CR 13-15, 34-38). Moreover, the findings contained in the Sanctions Order and the Findings of Fact give sufficient evidence that the sanctions ordered by the trial court "…were carefully weighed and imposed in an appropriate manner when justified by the circumstances." *Keith v. Keith*, 221 S.W.3d 156, 165 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

The Sanctions Order should be affirmed.

## III. THE TRIAL COURT WAS WITHIN ITS DISCRETION TO IMPOSE A DATE AND TIME CERTAIN FOR APPELLANT TO PAY THE SANCTIONS ORDERED. (APPELLANT ISSUE II.)

### A. LEA DID NOT SUPERSEDE THE SANCTION ORDER WHILE ON APPEAL, AS PERMITTED UNDER TEXAS LAW.

Texas Courts have an affirmative duty to enforce their judgments. *In re Crow-Billingsley Air Park, Ltd.*, 98 S.W.3d 178, 179 (Tex. 2003); Tex. R. Civ. P. 308. Lea has taken the position that her having appealed the Sanctions Order

should – in effect – abate the trial court's ability to enforce it; however, the Supreme Court of Texas and the other appellate courts have held otherwise. *Id.* ("Our procedural rules allow a judgment debtor to supersede a judgment, thereby suspending enforcement, by posting security set by the trial court, not by merely filing an appeal."); *Byrnes v. Ketterman*, 440 S.W.3d 688, 690 (Tex. App.—El Paso 2013, no pet.) (holding that the losing party "has a choice to either submit to the judgment or supersede the judgment by filing of a proper bond while the case is pending appellate review").

The Supreme Court of Texas addressed an issue with a similar argument in *Braden v. Downey*, a mandamus proceeding where a district judge ordered a litigant to pay sanctions, and gave a specific deadline by which the sanctions needed to be paid. *Braden v. Downey*, 811 S.W.2d 922, 924 (Tex. 1991). In *Braden*, the deadline for payment preceded the final resolution of the litigation in the trial court. *Id.* The relator contended that the imposition of the monetary sanctions would threaten his ability to continue the litigation. *Id.* In determining the circumstances under which appeal would provide an adequate remedy at law, the *Braden* court reasoned that deferral of the due date for payment of the sanction until entry of a final judgment would afford the sanctioned party an opportunity to supersede the judgment and perfect his appeal. *Id.* at 929 (citing *Thomas v. Capital Sec. Services, Inc.*, 836 F.2d 866, 868 (5th Cir. 1988)).

In the instant case, the Sanctions Order allowed Lea a period of over two (2) months to pay the sanctions, giving her plenty of time to have superseded the Sanctions Order, pending the outcome of this appeal; however, she did not avail herself of supersedeas relief, so Lea's Issue 2 should be overruled. *See Elec. Data Sys. Corp. v. Tyson*, 862 S.W.2d 728, 734 (Tex. App.—Dallas 1993, no writ).

### B. Lea did not adequately brief Issue 2, so this Court should affirm the judgment of the trial court.

Aside from one case relating to waiver of appeal upon payment of judgment – an issue Scott does not contest – Lea cites no authority for the position she adopts related to the deadline for payment of the sanctions imposed by the trial court, as required by Tex. R. App. P. 38.1(i). Her failure to do so constitutes a waiver of the issue on appeal, so Issue 2 should be overruled, and the Sanctions Order should be affirmed. *Franz v. Katy Indep. Sch. Dist.*, 35 S.W.3d 749, 755 (Tex. App.—Houston [1st Dist.] 2000, no pet.); Tex. R. App. P. 38.1(i).

### C. This Court has ruled on the issue of whether the sanctions ordered by the trial court constitute a debt, so Scott does not address that issue here

In her Issue 2, Appellant has taken the position that the sanction awarded in the Sanction Order is an "adjudicated debt" for which she cannot, constitutionally, be imprisoned, an issue which the parties briefed extensively in No. 01-14-00920-CV, Appellant's *habeas* application. This Court granted Lea's petition for *habeas* relief on the basis that "Lea cannot be imprisoned pursuant to either civil or

criminal contempt for failing to pay a debt." *In re McLaurin*, 01-14-00920-CV, 2015 WL 1967536, at \*4 (Tex. App.—Houston [1st Dist.] Apr. 30, 2015, no pet.). Based on this Court's prior ruling, Scott will not address whether the awarded sanction constitutes a debt.

## IV. ALTHOUGH THIS COURT IS NOT BOUND BY FINDINGS OF FACT, SUFFICIENT EVIDENCE EXISTS IN SUPPORT OF THE FINDINGS, THE SANCTIONS ORDER, AND THE DENIAL OF LEA'S REQUESTED RELIEF. (APPELLANT'S ISSUES I.C. AND 3)[4]

### A. APPELLATE COURTS MUST INDEPENDENTLY REVIEW THE ENTIRE RECORD WHEN EXAMINING A SANCTIONS ORDER, SO THEY ARE NOT BOUND BY THE TRIAL COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW. (APPELLANT ISSUE I. C.)

"In reviewing sanctions orders, the appellate courts are not bound by a trial court's findings of fact and conclusions of law; rather, appellate courts must independently review the entire record to determine whether the trial court abused its discretion." *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006). Since appellate courts are not bound by the trial court's findings of fact and conclusions of law, it seems that Lea's point challenging them should be disregarded as moot.

---

[4] Out of an abundance of caution, Lea's challenges to the findings of fact and conclusions of law will be addressed; however, in an effort to most efficiently present this Court with the appropriate factual review, Scott will review the trial court evidence only one time, in response to Lea's various challenges.

## B. STANDARD OF REVIEW FOR CHALLENGED FINDINGS OF FACT AND FOR FACTUAL SUFFICIENCY[5]

Findings of fact following a bench trial are reviewable for factual sufficiency of the evidence under the same standards used to review a jury's finding. *Catalina v. Blasdel*, 881 S.W.2nd 295, 297 (Tex. 1994). In determining a factual sufficiency challenge, the reviewing court must weigh and consider all of the evidence and determine (i) whether the evidence in support of a finding is so weak as to be clearly wrong and unjust, or (ii) whether the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

Unchallenged findings of fact with a reporter's record are binding on an appellate court unless the contrary is established as a matter of law or if there is no evidence to support the finding. *McGalliard v. Kuhlmann*, 733 S.W.2d 694, 696-97 (Tex. 1986).

## C. SUFFICIENT EVIDENCE EXISTS TO SUPPORT EACH OF THE TRIAL COURT'S FINDINGS OF FACT AND THE DENIAL OF LEA'S REQUESTED RELIEF

---

[5] While Lea, in Appellant's Brief, does not specifically state that she is challenging the factual sufficiency of the evidence supporting the denial of her requested relief, she does seem to apply the same standard, stating that "great weight and preponderance of the evidence supported [her position]." Again, out of an abundance of caution, Scott has included a discussion of the factual sufficiency standard.

Lea has challenged 24 of the 29 findings of fact issued by the trial court as well as the factual sufficiency of the evidence supporting the denial of Lea's requested relief. Sufficient evidence exists in support of each of the challenged findings, as follows[6]:

---

[6] Rather than recite each individual finding of fact herein, Scott has attached the Findings of Fact as <u>Appendix 3</u>, for ease of referral by this Court.

<u>Findings 3, 4, 5, 6, 7 – Amended Enforcement Pleadings</u>

At Flowers' request, the trial court took judicial notice of its file, including the Original Enforcement and each amendment to the Original Enforcement, over Lea's objection. (RR 3:38). Lea's statements to the effect that the clerk's record does not contain such a motion are curious in that Lea designated the original clerk's record, omitting each amended enforcement pleading, even though a reference to each amended enforcement pleading is contained in the Findings of Fact. The Original Enforcement is, in fact, contained in the clerk's record (Supp. CR 48-55), as are the 1st Amended enforcement pleading (Supp. CR 58-65), the 2nd Amended enforcement pleading (Supp. CR 66-70), the 3rd Amended enforcement pleading (Supp. CR 71-76), and the 4th Amended enforcement pleading (Supp. CR 144-148).

Additionally, the record is replete with references, by Lemkuil, to the various causes of action that Lea had, at one point, included, but had since abandoned. (See, e.g. RR 2:57, 58, 69). The argument that the trial court did not consider the allegations contained in these pleadings is untenable.

Additionally, the Findings of Fact specifically refer to each of the amended enforcement pleadings, stating, "Lea, by and through her attorney of record, failed to make reasonable inquiry into the facts surrounding the allegations contained in

the [New] Enforcement, the [1st] Amended Enforcement, the 2nd Amended Enforcement, the 3rd Amended Enforcement, or the 4th Amended Enforcement, prior to filing each such pleading."

The trial court took judicial notice of its file and these documents are contained as part of the clerk's record, so Findings 3 through 7 are appropriate.

Findings 11, 12, & 13 – Savings Bonds Assignments of Interest

The evidence adduced at trial was that, more than once, Scott signed documents purporting to transfer the applicable savings bonds to Lea. (RR 5:159; RE 20). The assignment document referenced in Finding 11 was prepared by Lea's then counsel of record, and Scott signed it. (RR 5:154-155). During the course of the litigation, Lemkuil determined that the parties were not using the appropriate forms for the transfer of these documents, and, as referenced in Finding 13, asked that new documents be executed, which Scott received on March 8, 2015, and executed on March 19, 2013. (See RR 5:146).

The purpose of the assignment document referenced in Finding 12 (included in RE 23) was to transfer savings bonds to Scott, which – as indicated in Appellant's Brief – is "of no moment."

Finding 14 – Attempted exchange of Rolex for Diamonds

Flowers attempted to exchange the Brannan Diamond for Scott's Rolex watch on several occasions, all of which are included in the record. (RE 20, 27,

56

and 32).  Moreover, Flowers conducted an extensive cross-examination of Lea concerning the Rolex watch, its whereabouts, and whether she was asked to return it (RR 3:94-101); Lea gave the following responses:

- "I never swore I didn't have it.  You didn't ask for it." (RR 3:94).

- That the divorce had been over for 2 years before sending the watch.  (RR 3:95-96).

- "I don't know when [you asked for it.]" (RR 3:97).

- In response to the question, "Is it still your testimony that there were no written demands made of you for that watch before you sent that watch to my office through Mr. Lemkuil almost two years after the fact?," Lea replied, "**I don't know.**" (RR 3:101).

For Lea to now take the position that no evidence was presented at trial concerning the Rolex watch and a proposed exchange for the Brannan Diamond is simply unfounded.

Finding 15 – Delivery of Diamonds

Lea testified that it is possible that she received the Brannan Diamond.  (RR 3:7).

Findings 16, 17, 18, & 19 – Christmas Ornaments & Photos

Like the Rolex watch, Flowers, on Scott's behalf, tried to make arrangements for Lea to retrieve the Christmas ornaments, etc. on numerous

occasions, each of which is reflected in the record. (RR 5:111-112; RE 27, 32, 33, 37-A). Moreover, Lea did appear, unannounced at Flowers' office for the purpose of retrieving these items, mentioned that not all of the property was present, and took the property that WAS present, but never specified what items she believed to be missing (RE 33).

Findings 20 & 21 – Bonus/Reimbursement

Lea did not, in fact, make demand for any alleged money due prior to filing the Original Enforcement or the New Enforcement, as none is apparent from the record. The record reference given in Appellant's Brief in support of their "response" to Finding 20 deals with the transfer of the Lincoln Investments account, which is not the subject matter of the finding.

Scott testified that a week prior to giving testimony on September 16, 2013, he became aware that during the 1st quarter of 2010, he received mileage checks totaling $150, and that Lea should receive 50% of that amount. (RR 5:140)

Findings 22, 23 & 24 – Oklahoma Property

The evidence concerning a deed to the Oklahoma property was not conflicting, as Lea asserts; on any of the 5 days of trial, she could not produce a copy of a deed that she had sent to Scott for signature. (RR 3:102-103) Lea further admitted that she "**had no** idea" whether she checked into the deed issue

before filing suit about it.  Id.  Scott agrees that Lea did not send a deed for Scott's signature until after the litigation had started, on May 3, 2012.

Findings 25, 26, & 27 – Lincoln Investment

Lea has taken the position that the attempts and difficulties experienced in transferring her portion of the Lincoln Investment account are "irrelevant"; however, Lea did not object as to relevance to ANY of the questions asked of her, of Scott, or of Ross concerning these items, so the objection would be waived. Moreover, the individual Lea hired to review the transfer of these funds approved Ross' calculations of the division.  (RR 4:79).  The fact that Lea delayed in providing an account into which assets should be transferred is undisputed.  Scott and Ross tried for nearly 2 years to receive the information from her (RR 4:81), and she did not complain about any of the calculations until August, 2012.  (See PE 19).

Lea testified that: (i) she hired Allen Weiner, a third party, to assist with dividing the Lincoln account (RR 3:81); (ii) she refused to sign documents that would have transferred her share of the Lincoln account to her (RR 3:78); (iii) she "**had no idea**" that the funds could not be transferred to her without her providing account information (RR 3:85); (iv) she – finally – admitted that she did not provide an account into which her share could be transferred until August, 2012 (RR 3:85), (v) she was no longer pursuing a claim against Scott related to the

Lincoln account (RR 3:86), and (vi) she had "**no idea**" how much money Scott had spent on lawyers dealing with that issue (RR 3:87).

Lea has not cited any evidence of the "more accurate percentage" for which she was hoping by filing suit.

Findings 28 & 29 – Reasonable Inquiry

Scott has reviewed evidence in support of these findings, above, in Section I.B., and disagrees that these findings are not the basis for sanctions. *See Scott & White*, 940 S.W.2d at 596 (Tex. 1996).

## CONCLUSION

Lea's suit was frivolous and brought in bad faith because she did not make adequate inquiry into the facts prior to filing, and even after she learned that the facts may not be as she believed, she and her lawyer continued to pursue a trial regarding Lea's spurious claims. The Sanctions Order and the Findings of Fact are sufficiently specific to support sanctions. Sufficient evidence exists to support the Findings of Fact, the sanctions ordered, and the entry of a take nothing judgment denying Lea's claims. For these reasons, the judgment of the trial court should be AFFIRMED.

Respectfully submitted,

F LOWERS & F RANKFORT,
      A TTORNEYS AT L AW


By: /s/ Todd Frankfort
      TODD FRANKFORT
      State Bar No. 00790711
      RICHARD L. FLOWERS, JR.
      State Bar Number 07180500
      5020 Montrose Boulevard, Suite 700
      Houston, Texas  77002
      Telephone 713/654-1415
      Facsimile 713/654-9898
      Email rflowers@rflowerslaw.com
      Service Email:  Service@rflowerslaw.com

      ATTORNEYS FOR SCOTT SUTTON
      MCLAURIN, APPELLEE


**Appendices**

Appendix 1 – Respondent's Exhibit 32
Appendix 2 – Respondent's Exhibit 37-A (as so designated herein)
Appendix 3 – Findings of Fact & Conclusions of Law

## TRAP 9.4(i)(3) Certification

I certify that (i) the foregoing is a computer generated document, (ii) I am relying upon the word count of the computer program used to prepare the document, and (iii) that the document contains 11,827 words.

<u>    /s/ Todd Frankfort    </u>
Todd Frankfort

## Certificate Of Service

I hereby certify that on this the 12th day of August, 2015, a true and correct copy of the foregoing Appellee's Brief was served in accordance with Rule 9.5 of the Texas Rules of Appellate Procedure on the following party's attorney of record by e-service:

_/s/ Todd Frankfort_
Todd Frankfort

LAW OFFICE OF RICHARD L. FLOWERS, JR.
5020 Montrose, Suite 700
Houston, Texas 77006
Telephone (713) 654-1415
Facsimile (713) 654-9898

June 21, 2011

Mr. Daniel J. Lemkuil (Via Facsimile 713/225-0099)
The Law Office of Daniel J. Lemkuil
1314 Texas Avenue, Suite 1515
Houston, Texas 77002

## FOR SETTLEMENT PURPOSES AND ADMISSBLE ONLY ON THE ISSUE OF ATTORNEYS FEES

Re:  No. 2009-06775; In the Matter of the Marriage of Lea Percy McLaurin and Scott Sutton McLaurin and In the Interest of Christopher McLaurin, a Minor Child; In the 312th Judicial District Court of Harris County, Texas

Dear Mr. Lemkuil:

I have called your office several times to discuss closing this case. I have not heard back from you.

This is another effort at resolving this matter and to minimize the time and unnecessary expenses accruing in concluding this matter. I am confident that if you'll call me back we can coordinate an agreeable date and time to exchange the following documents and other things necessary to end this.

Outstanding issues as per your February 1, 2011 letter:

1. Scott will exchange the diamond given to Lea by Patrick Brannan for his Rolex watch.

2. Scott does not have any coins belonging to Lea or Christopher;

3. Scott will execute a quitclaim deed for the Oklahoma property if you provide one;

4. Scott doesn't have the First Colony life insurance policy number 5164362;

5. Scott's financial advisor, Ross McLaurin, had been working with Lea's financial advisor, Allen Weiner, to transfer Lea's share of the Lincoln account ending 0305. That effort apparently broke down when Lea refused to provide information for an account where she wants her share of the Lincoln account



EXHIBIT
R-32

assets transferred. Ross is under the impression he had provided all documentation Mr. Weiner requested. If you'll provide the account information, Ross will transfer the assets. If you need additional documentation on this account let me know what you want and I'll do my best to provide it.

6. Scott has executed forms Bucky Allshouse sent for transferring the savings bonds. Copies of those documents were sent to Mr. Allshouse. If you want Scott to sign different forms, please provide the completed forms and we'll exchange them for Scott's bonds that Lea has and similar transfer documents signed by Lea.

7. Scott does not have any keys to Lea's Lexus GX470;

8. Bonus/reimbursement – Documents reflecting Scott's bonuses and reimbursements were previously provided and additional copies are attached for your convenience. Scott received no reimbursements during the period in question.

   On May 28, 2010 Scott received a bonus from GHA in the amount of $12,648.31. I understand that on the date the divorce decree was entered Lea received a $6,877.47 check, which is $553.32 more than half of the bonus. She was reportedly upset that day about the amount of the check. However, she accepted and negotiated the check.

   Scott's now aware of the overpayment. Scott offers to allow Lea to let keep the overpayment if that ends this matter. If that's not agreeable, Lea owes Scott $553.32.

9. Scott doesn't have a document listing the contents of the safe deposit boxes at BBVA Compass or Wells Fargo Bank as of September 3, 2010;

10. Scott has previously offered to make the Christmas ornaments, Gibson plates, and stuffed animals available for Lea to pick up but she never arranged to do so. Let us know when she wants to do that.

11. We will also arrange to have the family photographs and videos delivered to a commercial copying service for duplication. Let us know which service Lea wants to use. Each party is responsible for half of the copying charges.

12. Finally, page 12 of the AID states the amount Scott received for his 2009 tax refund: $31,943.00. Lea was provided with a copy of the U.S. Treasury Department refund check. Lea received a check for $16,000.00 when the decree was entered. The amount owed is a sum certain and Lea accepted the check. It's outside the scope of discovery to request Scott's tax return.

However, in a further effort to settle this matter Scott offers to provide a copy of his tax return in exchange for a copy of Lea's. If she received a refund she never disclosed such to Scott. Again, he's willing to let that go it we can end this.

I hope you'll view this as I do – a simple matter of coordinating the exchange of property. Thank you for your assistance in wrapping this up. I look forward to hearing from you soon.

Very truly yours,

Lori C. Blackwell

LCB:dmh
Enclosure

cc:     Scott S. McLaurin, M.D.

*LAW OFFICE OF RICHARD L. FLOWERS, JR.*
*5020 Montrose, Suite 700*
*Houston, Texas 77006*
*Telephone (713) 654-1415*
*Facsimile (713) 654-9898*

May 25, 2012

Mr. Daniel J. Lemkuil (Via Facsimile 713/225-0099)
The Law Office of Daniel J. Lemkuil
1314 Texas Avenue, Suite 1515
Houston, Texas 77002

## FOR SETTLEMENT PURPOSES AND ADMISSIBLE ONLY ON THE ISSUE OF ATTORNEYS FEES

Re:   No. 2009-06775; In the Matter of the Marriage of Lea Percy McLaurin and Scott Sutton McLaurin and In the Interest of Christopher McLaurin, a Minor Child; In the 312th Judicial District Court of Harris County, Texas

Dear Mr. Lemkuil:

Here's another attempt at settlement.

Outstanding issues as per your February 1, 2011 letter:

1. Lea has returned Scott's Rolex watch.

2. We received the partial diamond appraisal report you sent. The report describes a 2 carat stone. I've never seen the stone, but reportedly it does not appear to be 2 carats. Scott thinks the report may describe the engagement ring he gave Lea. In any event, Scott will take the stone and the report you sent to the store Lea proposed - Reiner's Fine Jewelry, 2210 Westheimer Houston, TX 77098. If he has the stone described in the report, I'll have the stone delivered to your office. If not, we ought to have the stone in Lea's engagement ring compared to the report. Otherwise, if Scott does not have the stone described in the report tell me how you want to handle.

3. Scott does not have any coins belonging to Lea or Christopher.

4. Please edit the quitclaim deed for the Oklahoma property you previously provided to include the following language: "For the Consideration, Grantor quitclaims to Grantee all of Grantor's right, title, and interest in and to the property, if any, to have and to hold to Grantee and Grantee's heirs, successors, and assigns forever. Neither Grantor nor Grantor's heirs, successors, or assigns will have, claim, or demand any right or title to the

property or any part of it". Subject to that change being made, Scott will sign a quitclaim deed.

5. Scott doesn't have the First Colony life insurance policy number 5164362. He does not have the "book" you described in our last telephone call.

6. We've produced all the statements for the Lincoln account you requested. Is this issue resolved? If so, the assets will be transferred to an account Lea designates. But to do that she will have to provide us the account information. If there's still a problem, what is it?

7. Lea delivered Scott's savings bonds. Enclosed are the fully executed forms you sent. Do we have any remaining issues on the savings bonds?

8. Scott does not have any keys to Lea's Lexus GX470;

9. Reimbursement – All reimbursements have been accounted for. Scott received no reimbursements following mediation. What reimbursement issue remains?

10. Bonus – Lea has received her share of the bonus. All the bonus money received was accounted for and shared. If there's still an issue about bonus money, what is it?

11. As further discussed below, the monthly draw that had been skipped because of Scott's low production following his bike wreck but paid after mediation has been disclosed. A cashier's check for Lea's share was tendered at Steven Jahn's deposition. You declined to accept it. Let me know if your client wants it.

12. Scott doesn't have a document listing the contents of the safe deposit boxes at BBVA Compass or Wells Fargo Bank as of September 3, 2010;

13. Lea picked up the Christmas ornaments, Gibson plates, and stuffed animals available. Is there any remaining issue here?

14. Let me know which service Lea wants to use to copy the family photographs and videos.

15. Lea has received her share of the 2009 income tax refund.

Attorney's Fees

This case should have never been filed. Scott performed and/or tendered full performance following entry of the decree. Lea refused to perform any part of her

obligations. She denied having Scott's Rolex until the day it was delivered. She's denied having the savings bonds that arrived with the watch. She's been in breach and can hardly complain about a breach even if there was one.

If there was a problem, Lea failed to send a written demand prior to filing this breach of contract case and thus cannot recover attorney's fees. Tex. Civ. Prac. Rem. Code §38.001, et seq. You could have even called me. Instead Lea just filed this lawsuit.

Lea told Scott (though the mediator) at the final mediation that he was getting a bonus. Lea has her share of that bonus. Through investigating that claim I came to learn that in addition to a bonus, Scott also received a monthly draw which had been withheld due to his lack of production following his November 25, 2009 cycling accident. I did not know prior to investigating that claim that the draw had even been withheld.

As soon as I sorted through what had happened, I reported it to you. No later than the day Steven Jahn was deposed the details of that were disclosed and Lea's share of the money tendered. That should have been the end of this.

Despite that effort this lawsuit continued. Another deposition was taken. We've been forced to prepare for final trial and even attended a pretrial conference. Scott's fees prior to writing this letter exceed $35,000

Scott ought to try this case and let Judge Dean decide who's in breach. Instead, once again he offers to resolve this entire matter and move forward.

If this case is settled immediately, Scott will waive recovery of his attorney's fees upon receipt of proof Lea has deposited $10,000 into Christopher's 529 Plan.

There's usually no point to deadlines on settlement proposals. So I'll say only that this offer can be withdrawn at any time. Let's end this.

Very truly yours,

Richard L. Flowers, Jr.

RLF:dmh
Enclosures

cc:    Scott S. McLaurin, M.D.

| | | |
|---|---|---|
| IN THE MATTER OF | § | IN THE DISTRICT COURT OF |
| THE MARRIAGE OF | § | |
| | § | |
| LEA PERCY MCLAURIN | § | |
| AND | § | |
| SCOTT SUTTON MCLAURIN | § | HARRIS COUNTY, TEXAS |
| | § | |
| | § | |
| AND IN THE INTEREST OF | § | |
| CHRISTOPHER MCLAURIN, | § | |
| A MINOR CHILD | § | 309th JUDICIAL DISTRICT |

## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Comes Now Respondent/Counter-Petitioner, Scott Sutton McLaurin ("Scott" or "Respondent"), and submits the following Proposed Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. If any statement in this document listed as a finding of fact is actually a conclusion of law, it will be considered as a conclusion of law  If any statement in this document listed as a conclusion of law is actually a finding of fact, it will considered a finding of fact.

2. Scott was married to Lea Percy McLaurin ("Lea" or "Petitioner"), and on September 3, 2010, that marriage was dissolved by Final Decree of Divorce ("Decree"), which incorporated an Agreement Incident to Divorce, which was also executed on September 3, 2010 ("AID")

3. In March, 2011, Lea filed a Motion to Enforce Final Decree of Divorce and Agreement Incident to Divorce (the "Enforcement"), in which she·
   * Sought to enforce the provision of the Decree and AID, awarding Lea the diamond given to wife by Patrick Brannan, which was located in a safe deposit box at Chase Bank, Medical Center location,
   * Sought to enforce the provision of the Decree and AID, awarding Lea the coins belonging to Lea or Christopher McLaurin, which was located in a safe deposit box at Chase Bank, Medical Center location;
   * Sought to enforce the provision of the Decree and AID, awarding Lea certain real property located in Payne County, Oklahoma;
   * Sought to enforce the provision of the Decree and AID, awarding Lea the First Colony Life Insurance Policy No. 5164362;
   * Sought to enforce the provision of the Decree and AID, awarding Lea a portion of the Lincoln Investments account ending in 0305,

- Sought to enforce the provision of the Decree and AID, awarding Lea certain United States Savings Bonds, in Scott's possession;
- Sought to enforce the provision of the Decree and AID, awarding Lea a 2006 Lexus GX470,
- Sought to enforce the provision of the Decree and AID, awarding Lea "fifty percent (50%) net of taxes of ANY bonuses or reimbursements received by Husband through April 30, 2010";
- Sought to enforce the provision of the Decree and AID, awarding Lea the contents of the safe deposit boxes at BBVA Compass and Wells Fargo Bank,
- Sought to enforce the provision of the Decree and AID, awarding Lea various Christmas ornaments, Gibson plates, stuffed animals, and family photographs and videos (collectively, the "Personal Property");
- Brought a cause of action for conversion against Scott; and
- Sought recovery of her attorney's fees.

4. On November 9, 2012, Lea served on Scott's counsel of record a First Amended Motion to Enforce Final Decree of Divorce and Agreement Incident to Divorce (the "1st Amended Enforcement"), in which she restated the allegations contained in the Enforcement

5. On March 6, 2013, Lea served upon Scott's counsel her Second Amended Motion to Enforce Final Decree of Divorce and Agreement Incident to Divorce ("2nd Amended Enforcement"), in which she abandoned all prior allegations, EXCEPT for those in which she.
- Sought to enforce the provision of the Decree and AID, awarding Lea the diamond given to wife by Patrick Brannan, which was located in a safe deposit box at Chase Bank, Medical Center location;
- Sought to enforce the provision of the Decree and AID, awarding Lea certain United States Savings Bonds, in Scott's possession;
- Sought to enforce the provision of the Decree and AID, awarding Lea "fifty percent (50%) net of taxes of ANY bonuses or reimbursements received by Husband through April 30, 2010";
- Brought a cause of action for conversion against Scott; and
- Sought recovery of her attorney's fees

6. On March 18, 2013, Lea served upon Scott's counsel her Third Amended Motion to Enforce Final Decree of Divorce and Agreement Incident to Divorce ("3rd Amended Enforcement"), in which she restated those allegations contained in the 2nd Amended Enforcement.

7 On March 27, 2013, Lea served upon Scott's counsel her Fourth Amended Motion to Enforce Final Decree of Divorce and Agreement Incident to Divorce ("4th Amended Enforcement"), in which she abandoned all prior allegations, EXCEPT for those in which she:
- Sought to enforce the provision of the Decree and AID, awarding Lea the diamond given to wife by Patrick Brannan, which was located in a safe deposit box at Chase Bank, Medical Center location,
- Sought to enforce the provision of the Decree and AID, awarding Lea "fifty percent (50%) net of taxes of ANY bonuses or reimbursements received by

Husband through April 30, 2010"; and

- Brought a cause of action for conversion against Scott.

8. In response to Lea's claims in the Enforcement, the Amended Enforcement, the 2nd Amended Enforcement, 3rd Amended Enforcement, and 4th Amended Enforcement, on May 13, 2013, Scott filed a Second Amended Motion for Sanctions for Bad Faith Filing ("Sanctions Motion"), seeking recovery of his attorney's fees, court costs, and litigation expenses, jointly and severally from Lea and from Lea's counsel of record, Daniel Lemkuil ("Lemkuil").

9. All issues were heard and ruled upon by the Court

10. On March 3, 2014, the Court issued its rendition in this matter by written letter addressed to both attorneys of record for the parties

*Savings Bonds*

11 Lea's prior counsel prepared and forwarded to Scott's counsel an Assignment of Interest, transferring certain United States Savings Bonds to Lea, and on or about September 8, 2010, Scott executed such Assignment of Interest, and returned it to Lea's counsel.

12. On or about October 28, 2010, Scott, by and through his counsel of record, provided a "corrected" Assignment of Interest transferring such United States Savings Bonds to Lea, which he had executed, to Lea's counsel of record, for Lea's execution, and Lea refused to execute such Assignment of Interest.

13. On or about March 8, 2013, while the litigation was pending, Lemkuil provided a new form of an assignment of interest in such United States Savings Bonds. Scott executed the new assignment of interest prior to trial

*Diamond & Coins*

14. Prior to the initiation of this lawsuit, Scott attempted to exchange the diamond and coins (if any) which had been located in the safe deposit box at Chase Bank, Medical Center location in Scott's name for the Rolex watch, which was awarded to him pursuant to the Decree and AID; however, Lea refused to cooperate in exchanging such items.

15. On or around November 7, 2012, Scott tendered to Lea, by delivery to her attorney, the diamond referenced in Lea's pleadings.

*Personal Property*

16. Prior to the initiation of this lawsuit, Scott packaged the Christmas ornaments, the Gibson plates, and the stuffed animals, and made them available to Lea

17. Lea made no attempt to take possession of the Christmas ornaments, the Gibson plates, or the stuffed animals after Scott made them available.

36

17. Lea made no attempt to take possession of the Christmas ornaments, the Gibson plates, or the stuffed animals after Scott made them available.

18. After the initiation of this lawsuit, Lea retrieved some of the Personal Property from Scott's counsel's office.

19. The AID states that Scott shall make the family photographs and videos available to Lea so that she may duplicate them; however as of her filing of this litigation, Lee had not requested the photographs or videos for duplication

*Bonus Funds*

20. Prior to initiating this litigation for performance of the contract for performance of the contract or payment of any alleged monies due and owing, neither Lea nor her attorney of record may demand upon Scott, upon his attorney of record, or upon any other duly authorized agent for performance or payment.

21. Prior to entry of the Decree, Scott paid all sums owed to Lea as a result of the provision of the Decree and AID awarding Lea "fifty percent (50%) net of taxes of ANY bonuses or reimbursements received by Husband through April 30, 2010."

*Oklahoma Property*

22. Prior to initiating this litigation for performance of the contract as it relates to the real property in Payne County, Oklahoma, Lea did not present any conveyance document to Scott for execution.

23. On or about May 3, 2012, Lemkuil forwarded to Scott's counsel a Quitclaim Deed, transferring the real property located in Pain County, Oklahoma, and asked that Scott execute such Quitclaim Deed.

24. Scott executed the Quitclaim Deed, and returned it to Lemkuil.

*Lincoln Investments Acct. No. 0305*

25. Prior to Lea initiating this litigation, Scott made numerous attempts to transfer Lea's portion of Lincoln Investments account no. 0305 (the "Lincoln Account") to her.

26. Lee continually refused to supply Scott, his financial advisor, or her own financial advisor with the information required to enable Scott to transfer her portion of the Lincoln Account to her

27. In November, 2011, after the unnecessary expenditure of attorney's fees, Lea provided the required information to enable the transfer of her portion of the Lincoln Account, and the transfer was completed

*Lea by and through her attorney of record*

28. ~~Decedent~~ failed to make reasonable inquiry into the facts surrounding the allegations contained in the Enforcement, the Amended Enforcement, the 2nd Amended Enforcement, the 3rd Amended Enforcement, or the 4th Amended Enforcement, prior to filing each such pleading.

*Lea's, by and through her attorney of record*

29. After the facts surrounding ~~Decedent~~ failure to make reasonable inquiry were brought to ~~his~~ *their* attention in a meeting with Scott's attorney of record, he continued to ~~prosecute~~ *pursue a trial regarding Lea's* ~~claims~~ *allegations.*

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of all parties and the subject matter of this suit.

2. The amended pleadings of the parties upon which the case was tried are in due form and contained all the allegations and information required by law

3. Lea proceeded to trial with the 4th Amended Enforcement as her "live" pleading.

4. The attorney fees incurred by Lea in this matter were both reasonable and necessary.

5. The attorney fees incurred by Scott in this matter were both reasonable and necessary.

6. The Court, having considered the above Findings of Fact, denied the relief sought in the 4th Amended Enforcement.

7. The Court, having considered the above Findings of Fact, granted the relief sought in the Sanctions Motion, and granted attorney's fees in the amount of $52,378.88 against Lea

8. On April 8, 2014, the Court entered a "Final Judgment on Lea Percy McLaurin's Motion to Enforce and Scott Sutton McLaurin's Motion for Sanctions and Bad Faith Filing."

7/18/2014

Judge Presiding

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging